IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CT-3016-FL

| | |
|---|---|
| DENNIS BLACKWELL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRYAN K. WELLS, )<br>)<br>Defendant.[1] ) | ORDER |

This matter is before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE 34). Also before the court is defendant's motion to seal (DE 40). The motion for summary judgment was briefed fully, and in this posture, the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff, a state inmate proceeding pro se, commenced this action by filing a complaint on January 15, 2021, asserting claims for violations of his civil rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges defendant was deliberately indifferent to his safety during the COVID-19 pandemic, in violation of the Eighth Amendment of the United States Constitution.

Following a period of discovery, and in accordance with the court's case management order and extensions, defendant filed the instant motion for summary judgment on January 6, 2023. Defendant argues plaintiff's official capacity claims are barred by the Eleventh Amendment,

---

[1] Formerly-named defendants State of North Carolina, Roy A. Cooper, III, and County of Pender were dismissed by court order on July 21, 2021.

defendant was not deliberately indifferent to plaintiff's conditions of confinement, and defendant is entitled to qualified immunity. In support of the motion, defendant relies upon a memorandum of law, statement of material facts, and appendix of exhibits thereto comprising the following: 1) declaration of counsel; 2) plaintiff's incarceration summary; 3) plaintiff's infraction history; 4) executive orders dated March 27 and July 29, 2020; 5) a news article identifying evolving mask guidelines; 6) portions of plaintiff's medical records; 7) medical definition for hypoxemia from the Mayo Clinic's website; 8) declaration of Brandeshawn Harris ("Harris"), chief deputy secretary of operations for the North Carolina Department of Adult Corrections ("NCDAC"); 9) declaration of defendant, warden at Pender Correctional Institution ("PCI"); and 10) a North Carolina Department of Public Safety ("NCDPS") COVID-19 response daily briefing dated May 20, 2021.

Plaintiff responded in opposition, relying on a memorandum of law, statement of material facts, and appendix of exhibits thereto comprising the following: 1) plaintiff's declaration; 2) two COVID-19 test results dated July 19 and October 25, 2020; 3) affidavits of PCI inmates Owen Williams ("Williams"), George Evans ("Evans"); and Reginald Russel ("Russel"); 4) disciplinary report dated December 1, 2020; 5) plaintiff's medical records; 6) plaintiff's second set of interrogatories; 7) grievance dated November 25, 2020; 8) plaintiff's initial disclosure; 9) plaintiff's first set of interrogatories and request for production of documents; 10) plaintiff's request for admission; 11) defendant's response to first set of interrogatories, production of documents, and request for admissions; 12) defendant's response in opposition to plaintiff's motion to compel; and 13) defendant's statement of material facts.

**STATEMENT OF FACTS**

2

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiff. At all times relevant to the instant case, plaintiff was housed in PCI and defendant was the PCI warden. (Pl.'s Decl. (DE 44-1) ¶ 4; Def's Decl. (DE 37-11) ¶ 2). On March 10, 2020, the governor issued a state of emergency for North Carolina due to the COVID-19 pandemic. (Def.'s Ex. 1C (DE 37-4) at 1).[2] The COVID-19 pandemic caused a need for the former NCDPS to have a constantly evolving response. (Harris Decl. (DE 37-9) ¶ 6). NCDPS sought to obtain the following objectives:

- [t]o protect staff, offenders and the general public by closely monitoring the health conditions of the offender population; with specific focus on medical triage, appropriate testing and tracking;

- [t]o monitor statewide concerns by managing information and providing timely messaging to staff, offenders, the general public and the media;

- [t]o cooperate with internal and external stakeholders for resources and continued operations;

- [t]o understand and disseminate guidance specific to the COVID-19 event relevant to DOP facilities, to prevent widespread exposure;

- [t]o continue to monitor and share developing intelligence from Prisons' facilities, and on any incidents involving offenders, staff, or visitors with symptoms similar to those involved with COVID-19;

- [t]o monitor movement of offenders to ensure reduced exposures throughout the prison facilities; and

- [t]o respond quickly and safely to incidents throughout facilities and validate cases through testing.

(Id. ¶ 7). NCDPS maintained "a running list of Current and Planned Actions, Strategies, and Tactics," which were included in daily briefing send to all prison facilities. (Id. ¶ 10; see also

---

[2] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

3

Def.'s Ex. 2A (DE 37-10)). NCDPS directed wardens to require staff to wear masks and to get tested for COVID-19 upon experiencing symptoms. (Def's Decl. (DE 37-11) ¶ 21).

It was defendant's responsibility to "ensure appropriate medical care was available to the inmate population and to ensure protocols were put in place and practiced, as stipulated by Division leadership, in efforts to prevent the spread of COVID-19." (Id.). Defendant implemented the further directives for PCI: 1) staff were to wear PPE, including masks, wash their hands, and disinfect as much as possible; 2) staff demonstrating COVID-19 symptoms needed to be tested; 3) COVID-positive inmates were quarantined away from COVID-negative inmates; 4) a power breezer disinfecting sprayer was used in the kitchen and gym at night and in the dorms during the day; 5) additional cleaning supplies, including bleach, were regularly used throughout the facility; 6) posters for handwashing techniques were hung in the prison units; 7) inmates were housed in cohorts to limit exposure; 8) when a cohort was quarantined, meals were delivered to its housing unit; 9) inmates assigned to the dining hall and kitchen were required to wear masks; 10) surfaces in the dining hall were sanitized between feedings; 11) cell blocks were quarantined if an inmate tested positive; and 12) anyone entering a contaminated cell block were required to wear full PPE, which would be discarded upon exit. (Id. ¶¶ 6–13, 16–20).

Defendant did not place PCI on lockdown and restrict all movement. (Pl.'s Decl. (DE 44-1) ¶ 7; Williams Aff. (DE 44-1) at 8; Evans Aff. (DE 44-1) at 10; Russell Aff. (DE 44-1) at 12; Pl.'s Ex. F (DE 44-1) at 35). Disregarding comments from inmates, defendant allowed partition doors to remain open and continued to move inmates from dorm to dorm. (Pl.'s Decl. (DE 44-1) ¶ 7). Correctional officers were not properly using personal protective equipment ("PPE"), such as wearing masks incorrectly and not wearing gowns to enter quarantined dorms. (Id. ¶ 8; Williams

Aff. (DE 44-1) at 8; Evans Aff. (DE 44-1) at 10–11). Extra cleaning supplies were not given to inmates for fear they would use them as weapons; however, backpack sprayers were used as a method of disinfectant. (Pl.'s Decl. (DE 44-1) ¶¶ 9–10). Inmates were not tested prior to assignment to the kitchen staff, and no one wore facemasks in the kitchen due to the heat. ((Pl.'s Decl. (DE 44-1) ¶ 11; Russell Aff. (DE 44-1) at 12; Pl.'s Ex. F (DE 44-1) at 36–37).

In March 2020, visibly sick correctional officers were continuing to work at PCI. (Williams Aff. (DE 44-1) at 8; Evans Aff. (DE 44-1) at 10). After an inmate died in March 2020, all inmates were not tested for COVID-19 until May 2020. (Evans Aff. (DE 44-1) at 10; Russell Aff. (DE 44-1) at 12). After inmates rioted because of the handling of COVID-19 restrictions, all inmates were again tested in October 2020. (Evans Aff. (DE 44-1) at 10; Russell Aff. (DE 44-1) at 12). Inmates were told that over 100 inmates tested positive, and the facility was placed on lockdown. (Evans Aff. (DE 44-1) at 10–11). Inmate kitchen staff continued to work and have contact with all dorms during the lockdown. (Pl.'s Ex. F (DE 44-1) at 35).

In July 2020, plaintiff was tested for COVID-19 and received a negative test result. (Pl.'s Decl. (DE 44-1) ¶¶ 4, 16; Pl.'s Ex. A (DE 44-1) at 5). Plaintiff was again tested in October 2020, and received a positive test result. (Pl.'s Decl. (DE 44-1) ¶¶ 5, 16; Pl.'s Ex. A (DE 44-1) at 6–7; Pl.'s Ex. D (DE 44-1) at 24). Plaintiff continues to suffer from complications as a result of contracting COVID-19, such as trouble swallowing and breathing, fatigue, and headaches. (Pl.'s Ex. D (DE 44-1) at 17–19, 21, 25, 27–31). During the relevant time frame, at least four deaths occurred at PCI. (Pl.'s Decl. (DE 44-1) ¶ 14; Owens Aff. (DE 44-1) at 9; Russell Aff. (DE 44-1) at 12; Pl.'s Ex. F (DE 44-1) at 35).

## DISCUSSION

A.	Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).[3]

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).  "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."  Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

---

[3]   Throughout this order, internal quotation marks and citations are omitted from all case citations unless otherwise specified.

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.   Analysis

Plaintiff alleges that defendant was deliberately indifferent to his health and safety during the COVID-19 pandemic. The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishments." U.S. Const. amend. VIII. Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994); see Hudson v. Palmer, 468 U.S. 517, 526–27 (1984). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). Under the first prong, "a prisoner must establish . . . a serious or significant physical or emotional injury" or that "he was incarcerated under conditions posing a

7

substantial risk of serious harm." Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015); Danser v. Stansberry, 772 F.3d 340, 346 (4th Cir. 2014).

The deliberate indifference prong requires a showing that defendant knew of and disregarded an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837–38; Danser, 772 F.3d at 347. A plaintiff may establish deliberate indifference by producing direct evidence showing the prison official had actual knowledge of the risk and failed to protect him. Farmer, 511 U.S. at 842–43. As an alternative, "a prison official's subjective actual knowledge can be proved through circumstantial evidence" by showing that the risk was "obvious" and that the circumstances suggest the defendant must have known about it. Makdessi, 789 F.3d at 133; see also Farmer, 511 U.S. at 842. The official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003).

Defendant does not dispute that the COVID-19 pandemic posed a substantial risk of serious harm. (Def.'s Mem. (DE 35) at 10). Thus, the court turns to the deliberate indifference prong.

The record evidence demonstrates that defendant had direct knowledge of the risk COVID-19 presented to inmates, including plaintiff. (See Def's Decl. (DE 37-11) ¶ 2). However, the undisputed evidence shows defendant took reasonable measures to address the risk of COVID-19 by implementing policies and procedures to protect against the spread of the virus. See Koon v. North Carolina, 50 F.4th 398, 407 (4th Cir. 2022) ("In general, good-faith efforts to

8

remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances.").

As noted above, defendant ordered a number of new policies and procedures to protect inmates from the spread of COVID-19. Defendant ordered the quarantine of COVID-positive inmates and those exposed to them, and locked down the facility when an outbreak occurred. (Def's Decl. (DE 37-11) ¶¶ 9, 17; Evans Aff. (DE 44-1) at 10–11). As acknowledged by plaintiff, defendant ordered testing of all inmates on two occasions. (See Evans Aff. (DE 44-1) at 10; Russell Aff. (DE 44-1) at 12). Further, defendant ordered staff to wear masks and extensive measures be taken to clean and disinfect all areas of the prison facility. (Def's Decl. (DE 37-11) ¶¶ 7, 10–16, 19). Courts have found that such measures are a reasonable response to a rapidly evolving, emergent global pandemic, thereby precluding Eighth Amendment liability. See Wilson v. Williams, 961 F.3d 829, 841–44 (6th Cir. 2020); Swain v. Junior, 958 F.3d 1081, 1088–90 (11th Cir. 2020); Hallinan v. Scarantino, 466 F. Supp. 3d 587, 605–08 (E.D.N.C. 2020). The fact that plaintiff contracted COVID-19 does not standing alone establish deliberate indifference. See Farmer, 511 U.S. at 844; Hallinan, 466 F. Supp. 3d at 605–08.

In response, plaintiff argues defendant was aware correctional staff and other inmates were not following the guidelines. For example, plaintiff alleges kitchen staff were not wearing masks, and correctional officers were not using PPE correctly. In his declaration, plaintiff makes the conclusory statement that defendant was aware of such behavior. (Pl.'s Decl. (DE 44-1) ¶ 8). The court is not required to accept such conclusory statements as true. See Papasan v. Allain, 478 U.S. 265, 286 (1986) (providing courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") Further, plaintiff has not indicated such a statement is based on his personal

9

knowledge and nothing in the record indicates plaintiff would have personal knowledge of what defendant knew. See Antonio v. Barnes, 464 F.2d 584, 585 (4th Cir.1972) (reversing district court's grant of summary judgment in favor of defendants when "there [was] no showing whatever that the statements [in plaintiff's affidavit] were made on personal knowledge as required by the Rule."); Guseh v. N.C. Cent. Univ., 423 F.Supp.2d 550, 555 (M.D.N.C.2005) ("[I]n the absence of an affirmative showing of personal knowledge of specific facts, a court cannot consider such an affidavit in making its summary judgment determination."). Accordingly, plaintiff has not established defendant was aware of and disregarded inmates' and subordinate officials' failure to wear PPE correctly. See Porter v. Clarke, 923 F.3d 348, 361 (4th Cir. 2019); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (discussing elements of claim for supervisory liability).

Plaintiff further argues there was a staffing shortage at PCI causing inmates to be required to assist correctional officers in handing out food trays, manning the canteen, and assisting with sanitizing dorms. (Pl.'s Mem. in Supp. (DE 42) at 10). Plaintiff does not explain how these assertions establish deliberate indifference on the part of defendant. Plaintiff also does not offer evidence establishing defendant was responsible for either the staffing shortage or inmates' job placements.

Finally, moving defendant is entitled to judgment as a matter of law on plaintiff's official capacity claims. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165–66 (1985). And in the context here, neither States, state agencies, nor state officials acting in their official capacities are "persons" subject to suit under § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Moreover, these claims are barred by the Eleventh Amendment.

10

See Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997). Exceptions to Eleventh Amendment immunity are not applicable here. See, e.g., College Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999); Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976); Ex parte Young, 209 U.S. 123, 159 (1908).

In sum, plaintiff has failed to establish a triable issue of fact on the subjective prong of his Eighth Amendment claim premised on the risk of exposure to COVID-19. Defendant therefore is entitled to judgment as a matter of law on this claim.

C.     Motion to Seal

Defendant also moves to seal plaintiff's medical records filed in support of the instant motion for summary judgment. Plaintiff does not object to sealing these records. The public has received adequate notice of the motion to seal. Regarding the documents the parties seek to seal in their entirety, no less drastic alternative to sealing is available because the private information appears throughout the filings sought to be sealed. Plaintiff's interest in preserving the confidentiality of his private health conditions outweighs any public interest in disclosure. Accordingly, the court will seal these records.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 34) and to seal (DE 40) are GRANTED. The clerk is DIRECTED to maintain docket entry 38 under seal and to close this case.

11

SO ORDERED, this the 25th day of September, 2023.

                                                         LOUISE W. FLANAGAN
                                                        United States District Judge